Kennon, J.
On the 24th of January, 1812, Mrs. Benson and her two daughters, Kitty and Alethea Moon, conveyed, in fee simple, to Samuel McCray, their undivided half of .6,000 acres of land in Clinton county, Ohio.
On the 25th of January, 1812, McCray gave back to them a mort,,gage to secure a balance of the consideration money, amounting to the sum of $2,543, payable by installments in two, three, and four years, 'without interest. McCray and Daniels (who claimed to own the other undivided half of the 6,000 acres) made a partition of the land. Soon after this McCray commenced selling out the land conveyed to him, in small parcels, and before the month of March, 1814, had sold, or contracted to sell, to some eight or ten different persons, portions of the land; and among other purchasers was John Adam-•son, who, in January, 1814, purchased from McCray 350 acres, and received from McCray a conveyance thereof. In March, 1814, Mc•Cray died insolvent. In 1816 the whole mortgage money became • due. In 1817 a scire facias was issued by the mortgagees against the administrators of McCray, and judgment rendered thereon in 1818. This judgment was afterward, in 1827, revived for about • 553] $5,400, *but nothing appears tó have been made on the judgment. In 1821, John Adamson sold the 350 acres to Ezra Kobin.son, and executed to him a title bond therefor. Eobinson went into •possession, and paid Adamson for the land. In 1822 an action of *554 ejectment was brought by the mortgagees, placing their right of' recovery on the mortgage. Ezra Eobinson et al. were made defendants to the action. At the May term, 1822, the plaintiffs obtained judgment against Eobinson et al., who at tho same term made-application to the court for the benefit of the occupying-claimant. law. This application was sustained by the court, although opposed by the plaintiffs’ counsel.
Commissioners were appointed, who reported the value of thetraets of land of each claimant, without the improvements, and also-the value of the improvements. Eobinson’s 350 acres, without the improvements, were appraised at $700, and the improvements-at $200.
At the August term, 1824, a final order was entered in the case, by the court, fixing a time within which the plaintiffs should make their election, either to pay the $200, and take possession, or tender a deed for the land, and receive the $700.
Within the time specified in the order, the plaintiffs having elected - to convey to Eobinson, deposited a deed for the land with the clerk of the court of common pleas of Clinton county.
Whether the plaintiffs in ejectment ever demanded the $700, or actually made a tender of the deed to Eobinson, does not appear very clearly. Eobinson, however, never paid the money, and the - plaintiffs in ejectment took possession of the land in 1826.
In 1830, Mrs. Benson died, leaving her daughters, Kitty and Alethea, her only children, heirs at law. In 1831, Alethea died, leaving her husband, William A. Skinner, and five children to survive her. In 1832, a bill was filed by James Fife and Kitty, his • wife, formerly Kitty Moon, and William A. Skinner, against the heirs and representatives of McCray for the purpose of foreclosing tho equity of «redemption to the lands described in the mort- [554 gage. In 1833, the amount found due on the mortgage being $9,195.62, and the land, including the 350 acres claimed by the heirs of Eobinson, being appraised at $8,226, being less than the amount due, a strict foreclosure, without sale, was decreed by the court. In 1834, Fife and Skinner divided the land between them.
The original bill in this case was filed in May, 1846, and an amended bill filed, in 1848, by the heirs of Eobinson et al. against Skinner, Fife and wife, et al., the object of which was to redeem the-whole of the mortgaged premises, or at least the 350 acres claimed- *555 by Robinson, and to compel the heirs of Adamson to release to complainants.
The bill and amended bill are both answered by Skinner, by Fife and wife, et al. Replications are filed, and testimony taken. It is claimed that the heirs of Robinson are not entitled to redeem the whole or any part of the mortgaged premises for five distinct reasons.
I. That the transaction is really nothing else than a purchase and sale of real estate, and is governed by the common rules appli-cable to vendor and purchaser.
II. That the complainants are perpetually barred by the proceeding under the occupying-claimant law,
III. That it is a case of gross staleness.
IY. That the statute of limitations is a bar
Y. That more than one-half the land is clearly beyond redemption, and that the whole must be redeemed or none.
We have considered all these objections carefully, and have come to the conclusion that neither of them can avail the respondents.
As to the first objection, it does not appear very- clearly how much McCray paid Mrs. Benson and her daughters at the date of ■the purchase of this land, but we are satisfied that more than one thousand dollars was in effect considered as received by them.
They executed a deed in fee to McCray, and about the same time 555] took from him a mortgage to secure the balance *of the purchase money, payable as follows : $543.50 in two years, $1,000 in three years, and $1,000 in four years, without interest, making in -aH $2,543.50.
That this was a contract between vendor and. purchaser, as •claimed by respondent’s counsel, there can be no doubt. It was the mode adopted by the parties, to secure to the vendors the payment of the balance of the purchase money of the land. But the vendors and vendee had agreed that the fee should be conveyed to, and vested in, the vendee at the time of the purchase. So far as the title to the land is concerned, it is not an executory, but an executed contract. It is not an agreement to convey, but an actual conveyance. The parties have, by their own contract, for reasons •which we can not now inquire into, placed themselves toward each other in the relation of mortgagor and mortagee, with all the rights and remedies which pertain to them as such, and no other. No authority is found by counsel for respondents, which sustains *556 the doctrine that this bill must be regarded in the light of a bill for the specific performance of a contract, or, that if it had been filed by McCray, it would have been necessary for him to have averred and proved his readiness and willingness to pay the balance of the purchase money when it became due. To put such a construction upon the transaction would, in effect, be to make a new contract for the mortgagees, and to defeat the very object of the -parties, in placing themselves in the relation of mortgagor and mortgagee.
McCray was seized in fee simple of the land by the act of the vendors, and on the next day the land was conveyed to the vendors by way of mortgage, to secure to them the payment of $2,543.50, in four years, without interest; and we are unable to perceive that it makes any difference, either in reason or upon authority, whether this sum was a part of the purchase money, or any other just debt. It was secured by mortgage, and all the incidents of redemption and foreclosure were attached to it as much as to any other mortgage. ■The rights of the mortgagees were not increased, *nor were [556 the rights of the mortgagor diminished, because the mortgage was executed to secure the purchase money. It was a mortgage, and to be treated as such, in any court.
II. It is claimed that the complainants are perpetually barredj by the proceedings under the occupying-elaimant law, and in argument it is said that it was so held by the court of common pleas, .and also by the district court, before the prayer of the petition for a rehearing was granted. This point is much relied upon by the respondent’s counsel, and deserves consideration.
At the May term, 1822, of the court of common pleas of Clinton, «ounty, the grantors to McCray recovered, in an action of ejectment against Ezra Robinson and others, claiming under McCray, judgment for the mortgaged promises. Ezra Robinson, the ancestor of complainants had, before that time, by title bond, acquired all the interest in equity of John Adamson to 350 acres of the mortgaged land, which Adamson had purchased from McCray, and for which he had McCray’s deed. Robinson, among others, claimed the benefit of the act for the relief of occupying claimants, and his application was sustained by the court. The improvements on Robinson’s 350 acres were appraised at $200, and the land at $700, ■and it was ordered by the court that the plaintiffs have the term >of five months within which to make their election, either to pay *557 Robinson the $200, or to tender to Robinson a general warrantee deed, and in the event of, tendering the de.ed, Robinson should be entitled to five months from the time 'of such tender to pay the said sum of $700, the appraised value of the'land.
This is the substance of the order of the court, although the order was made before the appraisement, and the amount to be paid depended on such appraisement, within.the five months fixed by the court. The plaintiffs elected to make a deed, and did leave the deed with the clerk of the court of common pleas of Clinton county, but the money was not paid by Robinson, and the plaintiffs took 557] possession under *their judgment, and this failure to pay, on the part of Robinson, is considered a perpetual bar to his right to redeem. That Robinson, before the judgment in ejectment, had acquired such an interest in these 350 acres, as entitled him to redeem the premises, and remove the lien of the mortgage, can not be doubted. Did he lose that right by claiming the benefit of his improvement? is the question. It is very clear to us, that the plaintiffs in ejectment, sought a recovery of the possession of the qmemises, as mortgagees only; they claimed no higher or better title; they relied upon the mortgage alone as evidence of thoir title. They had sought to recover the money, secured by a scire facias, on the mortgage, and had failed; there was a breach' of the condition of the mortgage, and they, as mortgagees, were, at law, entitled to recover and hold possession of the land, accounting for-the rents and profits until the mortgage was satisfied. They claimed their rights as such, and had the judgment of the court in their favor.
Suppose this action of ejectment had been brought against McCray, the mortgagor, in his lifetime, after he failed to pay the mortgage money. That the amount due upon the mortgage, was $1,000, and that it was borrowed money, and not the balance of the purchase money. That the land was worth $10,000. That the improvements were worth $200. That he and his counsel and the court wore of opinion that the mortgagees had no right to take possession of the land until he had been paid for the improvements made after the execution of the mortgage. That he claimed that right. That the court had ordered the appraisement, and gave to the mortgagees the right, either to pay the $200 or make a warrantee deed for the land, and if McCray did not, within five months pay to the mortgagees the sum of $9,800, that the mortgagees might take *558, 559 possession of the premises without paying the $200. That McCray failed to pay the $9,800, and the mortgagees took possession under their judgment, in ejectment. Under such circumstances, would either a court of law or equity, say the mortgagor had lost all title to his land, worth *$10,000 ? Would his right of redemption [558 be forever lost? If he should pay the costs of ejectment, and tender to the mortgagees the next day after they had taken possession, the amount due upon the mortgage, would a court of equity hold him perpetually barred from redeeming the land ? It seems to me no such construction can be placed on the act for the relief of occupying claimants in force at the time of the order of the court.
■ The language of the act is in these words, so far as the same relates to the neglect or refusal of the occupying claimant, to pay the value of the land without the improvement: “ If the occupying claimant shall refuse, or neglect to pay to the successful claimant’ the value of the land without the improvement, so as aforesaid assessed, within such reasonable time as the court shall allow, then a writ of possession shall be issued in favor of the successful claimant.” See 2 Chase’s Stat., 1166.
Thá statute gave to the successful claimant the right to pay for the improvements, or take the value of the land without the improvements. If he failed to pay for the improvements, he. could not take possession, but if he elected to take the value of the land without the improvements, and tendered a deed for the same to the occupying claimant, and he neglected or refused to pay, then the successful claimant was entitled to possession without paying for the ■ improvements.
In the supposed case, therefore, if the action of ejectment had-been brought against McCray, and he had claimed adversely to the plaintiffs, and had been allowed the benefit of the act, and had failed to pay the $700, being the appraised value of the land, the only thing which the plaintiffs' at that day could have done, would be to do exactly what they did do, take possession of the land.
But what title would they have acquired by taking possession? It appears to me that’the question is easily answered. They would have taken possession under the judgment in ejectment, and would have had precisely the title which they *had at the time of [559 the recovery in ejectment, and no other or better title. They claimed title as mortgagees only, and would enter and hold as such. *560 The mortgagor would have the same right to redeem which he had before the deed was tendered and money refused.
There is nothing, therefore, in the order of the court before the deed was tendered, and the payment of the money refused, which in the least increases the rights of the plaintiffs in the action of ejectment, or which could have changed their title from that of mortgagees to a title in fee, free from the equity of redemption. ‘
The plaintiffs in ejectment are in no better situation than if the action had been brought against McCray. Robinson had the same right to redeem that McCray had, and the plaintiffs had possession as mortgagees only.
Indeed, one action of ejectment and recovery by the plaintiff is no bar to an action being brought by the defendant in any case, and trying the title over again; much less could it be a bar in the supposed case, after payment of the mortgage money, merely on the ground that the mortgagor had in the first action claimed to hold adversely, and the mortgagee had claimed the right of possession, until, and .only until, the mortgage was satisfied.
In determining this point, we mean to say only that in this proceeding under the occupying-claimant law, the plaintiffs acquired •no better title than they had before the action was brought, and •.that the defendant lost no right of redemption which he had before ithat time, without at present saying anything of a subsequent adverse holding by the plaintiffs.
III. The third objection to a decree for complainants is that it is :a case of gross staleness, and the fourth is that it is barred by the .■statute of limitations. These two objections, although far from be-ling the same, may be considered together.
Ezra Robinson, as we understand the evidence, died in possession .560] of these 350 acres, early in the spring of 1826, *and the ■ original bill was filed on the 18th of May, 1846, less than twenty - • o.ne years after the mortgagees took possession of the land. If we ¡are right in our conclusion as to the effect of the application for the benefit of the occupying-claimant law, Ezra Robinson, at the time the mortgagees took possession, had an estate in the land, a right to redeem, which was not affected by that proceeding; an estate which descended to his heirs at law, and vested in them the same right of ■redemption which he himself had. Have they lost this right by the •statute of limitations, by lapse of time, or staleness of the claim? .Although, strictly speaking, there is no statute of limitations appli *561 cable to the right to redeem mortgaged premises in the possession of the mortgagee, yet courts of equity, acting on the analogy of the statute of limitations, would hold such right barred after the lapse of twenty-one years, where the mortgagee had during all that time held possession adversely to the mortgagor, and claiming not to hold as mortgagee, but as owner; but he must hold the possession in such manner that if the legal title and right of possession had been in the mortgagor, ho would have been barred of his action of ejectment at 'law. In this case twenty-one years had not elapsed from the time the respondents took possession until the filing of the original bill. The original bill was demurred to on the ground that complainants claimed to redeem only the 350 acres, and not the whole tract. This demurrer was sustained, and leave granted to the complainants to amend their bill, which was done in May, 1848, more than twenty-one years from the time the mortgagees took possession.
The court, in granting leave to amend, annexed to the leave the following conditions, which were placed on the journal of the court: “ The question raised in the cause as a matter of defense, growing out of the statute of limitations, or the staleness of complainants’ demand in the premises, the court do grant the complainants leave to amend as aforesaid, so as to prepare the cause for trial upon the merits, reserving, however, the said question so growing out of the ^statute of limitations, or the staleness of complainants’ de- [561 mand in the premises, the court do grant the complainants leave to amend as aforesaid, so as to prepare the cause for trial on the merits, reserving, however, the said question so growing out of the statute of limitations, or the staleness of complainants’ demand for hearing and decree hereafter, and should the complainants’ equity be at this time barred, and the effect of the amendment under leave of the court, should be such as to remove the bar, and should be so determined on the further hearing of the cause, then the complainants are to take nothing by this leave to amend, but the cause is to be dismissed in the same manner that it would have been under issue as it stood at the time of the filing of this decree.” The amended bill prayed an account and a redemption of the whole of the mortgaged premises. We are of opinion that the claimants had aright in this ease to redeem the 350 acres, and were not bound to redeem* the whole, as will be hereafter stated; and that, therefore, the suit' ought to be considered as commenced on the 18th of May, 1846’;- *562 but according to tbe view which we take of this question, it is wholly immaterial whether the bill shall be considered as filed in 1846 or in 1848. It is not the possession merely, but the nature of that possession, which operates in equity as a bar to the redemption by the mortgagor, or those claiming title under him. So long as the mortgagees admit that they hold as mortgagees, or by their acts show that they hold as such, and not by any other right, time does not begin to run against the right to redeem.
Any deliberate act done, or acknowledgment by the mortgagee or mortgagor while in possession of the premises, evincing the existence of the mortgage, will save the rights of the mortgagee on the one hand to foreclose, and of the mortgagor on the other to redeem.
The law is thus stated in one case: Any deliberate act of the mortgagee, done within twenty years, by which he recognizes the existence of the mortgage as such, will prevent the right of redemp562] tion from being barred. Thus, when twenty-three *years after the date of the mortgage the mortgagee made a will, devising that in case of redemption the mortgage money should go in a certain way: held, that the heirs of the mortgagor might redeem in eighteen years after the date of the will.
The authorities are numerous and conclusive, that any deliberate act done by the mortgagee in possession, evincing the existence of the mortgage as such, and that he holds possession by virtue of the mortgage only, will prevent the equitable bar.
In this case, the mortgagees and those claiming under the mortgage have done no one act, until 1833, evincing anything else than that they held as mortgagees. In 1818 they pursue the statutory remedy by scire facias on .the mortgage, and obtain judgment. In 1822 they bring the action of ejectment founded on the mortgage as such, and obtain the judgment of the court that as mortgagees they are entitled to possession of the land. In 1826 they take possession under that judgment — less than twenty-one years before the commencement of this suit. In 1827 they revive the judgment obtained on the scire facias, and take judgment for the amount of the original judgment, and interest. In 1833 (only thirteen years before the commencement of the suit in 1846, and fifteen before filing the amended bill) they take a decree of foreclosure, finding due them over $9,000, including all the expenses, of preserving their title to these lands as mortgagees, and claim by that deliberate act that *563 they hold as mortgagees, and that the whole of the mortgaged premises shall be subjected as such to the payment of the mortgage money. It is not easy to see how a more definite and deliberate act, acknowledging that they held as mortgagees the whole of this land, including the 350 acres, could have been, done than is here shown. They were in possession as such. They go further, and procure a strict foreclosure, and take on that foreclosure these 350 acres, which they held in possession, in part satisfaction of the mortgage money.
They knew from the very evidence of title which Robinson produced *on the trial of the action of ejectment, and on his ap- [563 plication for the benefit of the oecupying-claimant law, that he had an estate in the land, that he had a right of redemption; and they acknowledge by their proceeding in 1833 that this same land is still subject to be redeemed; and the very object of the bill is to force that redemption, or if not redeemed, that that right of redemption shall be forever after foreclosed. The statute of limitations, therefore, did not in equity commence to run until 1833, and forms no bar to the right to redeem.
This bill in chancery to foreclose, however, was prosecuted in the name of Fife and wife, and of Skinner, the husband of the deceased sister of Mrs. Fife. Mrs. Skinner’s children were not parties to the bill, nor were any othei’S than the heirs and representatives of McCray made defendants to the bill. The heirs of Robinson, the present complainant, were not parties, and were not therefore bound by the decree.
It must be remembered that the condition of the mortgage was to pay to Mrs. Benson and her two daughters, jointly, the $2,500 secured by the mortgage; and there can be but little doubt that McCray, after the death of Mrs. Benson, might have redeemed by paying to the surviving daughters. So, also, he might have paid to Mrs. Fife, after the death of Mrs. Skinner, who was the only surviving obligee or grantee in the mortgage. The heirs at law of Mrs. Skinner might have been made parties, but were not necessary parties to a bill to collect the mortgage money.
These heirs, however, so far as we know, were never in the actual possession of the mortgaged premises; and we do not see any bar which they could claim by virtue of possession or otherwise.
Robinson’s heirs were not parties. They were necessary parties, and therefore were not bound by the decree; but although not par *564, 565 ties, the court will look to the acts and doings of those who filed the bill, and who had a right to do so, and who were in possession of 564] the mortgaged premises, *in order to determine whether they held adversely to the heirs of McCray or Robinson, or whether they held as mortgagees, acknowledging the right of the mortgagor, and those claiming under him to redeem. We are clearly of opinion that there was no adverse holding until after the decree of 1833. That, at the time of taking that decree, the heirs of Robinson held the equity of redemption in the land and estate, which descended to them from Ezra Robinson, and that since that, time there is no such lapse of time or staleness of claim as ought to induce a court of equity to reject their claim.
If the court had come to the conclusion that the heirs of Robinson must redeem the whole or none, and we had found, as the fact appears to be, that numerous persons had made purchases from the mortgagees of parts of that tract of land, bona fide, without any actual knowledge of Robinson’s claim, and had made valuable improvements under the eye of the heirs of Robinson, we might have been induced to consider as to these persons more carefully the staleness of this claim as against them. The 350 acres, however, are still in possession of those who are not purchasers. They are held by the heirs of Mrs. Skinner, one of the mortgagees.
It is said, however, and this is the fifth objection to a decree, that the heirs of Robinson must redeem the whole, or they can redeem no part of the mortgaged premises. This, as a general proposition, is undoubtedly true.
But what are the facts of this case ? At the time of the decree of foreclosure, Robinson’s heirs were the owners of 350 acres of the whole tract, and McCray’s heirs of about 2,392 acres. To the land owned by McCray’s heirs, the mortgagees extinguished the right of redemption by that decree, and the heirs of McCray became barred, being parties to the decree. The heirs of Robinson were not parties, and their right to redeem was not affected by the decree. It is admitted by the counsel for respondents that more than half the land can not now be redeemed; but if the whole of the land belonging, at the time of decree, to the heirs of McCray, 565] *was yet in the hands of the mortgagees, why could not Robinson’s heirs redeem the 350 acres without being compelled to redeem the whole ?
The right to claim that the whole, and not a part, shall be re *566 deemed, is a right which appertains to the mortgagees and not to the mortgagor. The reason of the rule is, that the mortgagee shall not be compelled to divide or apportion his security. The reason of the rule itself ceases in this case, when we see that the mortgagees here, by their own acts, extinguish the equity of redemption to all the land except the 350 acres owned by Robinson’s heirs. They have made themselves the absolute owners of this land by their own acts, and have sold and disposed of a large amount of it to strangers, who have taken possession and improved the same. We see no want of equity in leaving the mortgagees in the position in which they have voluntarily placed themselves by their own decree, and consider them as the absolute owners of all the land except the 350 acres. The mortgagees having become the owners of the 2,392 acres, if the heirs of Robinson were to pay the whole of the mortgage debt, they would have a right to immediate reimbursement from the mortgagees, of so much thereof as the lands absolutely held by them ought to contribute to the redemption. This process would be a vain thing.
Being therefore of opinion that the 350 acres may be redeemed by the heirs of Robinson, we find that, before the decree of foreclosure, upward of 500 acres of the 3,000 acre tract had been sold for taxes, and that an action of ejectment having been brought, and recovery had, by the mortgagees, against one G-ibson, the claimant underthetaxsale,and an application made for the benefit of the occu-. pying-claimant law, the mortgagees, a short time before the decree, conveyed said 500 and odd acres to Gibson, and received therefor the sum of $1,623.17, of which no account was taken in the decree of foreclosure. That the decree should have found due the complainants the sum of $7,572.45, instead of the sum of $9,195.62. So far, therefore, as there *is any evidence before us at this [566 time, we feel warranted in saying that the decree was for $1, 623.17 too much. The whole of the land subject to be sold at the time of the decree (excluding the G-ibson land) amounted to 2,742 acres, and was appraised, at that time, at three dollars per acre, making $8,226. That the 350 acres owned by Robinson’s heirs, and the 2,392 acres owned by McCray’s heirs, were of about ' equal value, acre for acre; that the value, of the ,2,392 acres, to which the mortgagees obtained an absolute title by the decree, amounted, at three dollars per acre, to $7,176, leaving $396.45 as the sum which the Robinson’s would have been bound to pay, at *567 ■the date of the decree of foreclosure, in order to redeem the 350 acres. For equity required that the land owned by McCray’s heirs should be first resorted to, for the payment of the mortgage money, before resorting to the 350 acres owned by Robinson’s heirs, and for which McCray had been fully paid. This last sum, therefore, with interest from the date of the decree of foreclosure, is the sum to be now paid by the heirs of Robinson, subject, however, to be increased or diminished by an account to be taken of the rents .and profits, improvements and taxes of the 350 acres since the decree.
In stating the account, the master will state it in two aspects, one with rests made annually, and the other without any rests.
As to other parts of this case, we find that neither of the other-parties to this proceeding, who claim the right to redeem parts of this land, have any rights, either as against the mortgagees or heirs of McCray; and that the heirs of Robinson have no claim in 'equity to redeem the other tract of land mentioned in the bill of complaint; and that the bill itself is not multifarious ; that the heirs of Adamson are proper parties to the bill, not only for the purpose of settling the question as to whether the heirs of Robinson have the right of redemption, in the 350 acres, as against the heirs of Adamson, but also as against the mortgagees. A decree of reference may therefore be drawn accordingly.
*Warden, J.
No view I can take of this case shows any equity on the part of the complainants. They ought to have a perfect equity, however, to be warranted in redeeming these lands. They ask, not the enforcement of a right to the possession of property of which some one has deprived them in mere wrong or fraud against them, but the allowance, by a court instituted to spften the severities of the law, of an equity to redeem that which has passed from them through their own default, or that of their ancestor. This court has refused at this term (Fitch v. Huntington & McIntyre, ante) even to restore to a party his strict legal right of being subjected to no judgment or execution save according to the laws and usages of the courts, unless he founds his claim to the enforcement of that right upon a sfrict performance of equity on his own part. How much stronger would he the position of the court if the thing demanded were, as it is here, a mere equity! The very notion of the estate called an equity of redemption, its’name and *568 its history, all show that the rodemptioner must be in a position, not to seize some harsh and technical advantage, but to prove him.self worthy of regard in the courts, by doing justice which alone he is to receive. It is in the gratification of contemplating this offspring of equity that our law writers forget their gravity to exclaim : “ Returning justice lifts aloft her scale.” Whenever it would be unjust to allow redemption, no redemption can be demanded. When the rodemptioner can not take what he asks without doing injury for which he is fairly responsible, and which can not be redressed by him or by the court, he ought to be dismissed. I care not how his want of equity may be designated. Let it be said his words, his acts, or his silence, have equitably estopped him. Or, if some'strict definition of estoppel forbid such an expression, let his case be considered as that of one who has abandoned his right, so that it would be like a gift if he should ever get it again. The change or acquisition of property, worked by judgment, challenged all the known designations of title, and found a *fit name in [568 an addition to the denominations already used when it was called title by judgment. Nay, this very estate now known as the equity of redemption added a new name to the body of legal nomenclature. Not the name by which it may be distinguished, but the substance of equity which supports it, gives that estate the high favor and countenance it has come to enjoy. “Once a mortgage, always a mortgage,” is no ancient maxim; not half so old as that vevjprinciple of equity jurisprudence, “ he who seeks equity must do equity " —or that kindred maxim, “he that hath committed inequity shall not have equity.” In name and in nature, the equity of redemption is a graft on the law; and with this precedent of finding a new name for a new thing before us, we shall not have to hesitate long for a word to describe the case of one who has so behaved as to lose that equity.
But what must such behavior be ? The answer must be various as the cases themselves. Take the instances whose hardship first led to the cautious promulgation of this new doctrine of mortgages. In one of them it is modestly and almost timidly said: “ The court conceived, as it was observed in chancery, that the said lease being but a security, and the money paid, though not at the day, the lease ought not to be void in equity.” Emanuel College v. Evans, 1 Rep. in Ch. 10. Now, if in all such cases the debtors had behaved so as to show that they never meant to pay the debt, or to *569 claim, back the estate; if they had not been watchful and anxious, and only unfortunate, I doubt whether Sir Matthew Hale would ever have been betrayed into the complaint that by the growth of equity the heart of the common law was eaten out; for, coming into court, not only culprit but convict, by his own confession, of a great default, the mortgagor would always have been told that there was no room for him in a court of equity. He had, by his recklessness, committed inequity, he should not have equity; so would the chancellor have dismissed him. If the apparent value of the estate 560] even, had deceived the mortgagor into *the belief that he would never desire its redemption, and he had left it to the mercy of the mortgagee without further care for its fate; or if the hopelessness of his pecuniary'condition had led him to abandon all thought of redemption, and to show this abandonment in the whole of his words and actions, no claim he might afterward make would be respected in a court of equity.
For how stands this matter in the oracular books of the law? “As soon as the estate is created, the mortgagee may immediately ■enter on the lands, but is liable to be dispossessed, upon performance of the condition by payment of the mortgage money at the day limited. And therefore the usual way is to agree that the mortgagor shall hold the land till the day assigned for payment; when, in case of failure, whereby the estate becomes absolute, the mortgagee may enter upon it and take possession, without any possibility, at law, of being afterward evicted by the mortgagor, to whom the land is now forever dead. But here again, the courts of equity interpose; and though a mortgage be thus forfeited, and the estate absolutely vested in the mortgagee at the common law, yet they will consider the real value of the tenements compared with the sum borrowed. And if the estate be of greater value than the sum lent thereon, they will allow the mortgagor at any reasonable time to recall or redeem his estate; paying to the mortgagee his principal, interest, and expenses; for otherwise, in strictness of law, an estate worth £1,000, might be forfeited for nonpayment of £100, or a less sum. This reasonble advantage allowed to mortgagors, is called the equity of redemption.” 2 Bla. 169. This language of Blackstone is precisely such as one familiar with the history and real character of the estate might be expected to use, and it is full of suggestion. The thing spoken of is “ allowed;” it is an “advantage;” it must be a “reasonable advantage;” it *570, 571 has its origin in the cases of foolish or unfortunate borrowers on the one hand, and of hard and exacting lenders on the other; and it has great regard to the value of the estate as compared with the amount of the *loan. Now, while developments of the doc- [570 trine first taught on this subject, call for a few qualifications or additions to the language of Blackstone, it must bo remembered that the estate itself is always an equity, or it is nothing. And, so understanding it, let us suppose a case like that now before this court, as presented to the chancellor who made the first step of innovation in this particular. Instead of the needy creditor as plaintiff, and the professional money-lender as his antagonist, let us put before that court parties such as those in this record; and let it be fancied that there were in England lands open as those here in question to the operations of the speculator, and valuable as these 'may have now become as a homestead or a favorite possession for any purpose. They are bought and mortgaged for the purchase money by one large speculator, and divided by many purchasers under him into as many tracts. The first speculator forfeits his estate at law, dies insolvent, and leaves his affairs in hopeless confusion. The purchasers under him are many, strangers to each other, and from the very nature and necessity of their condition, in some degree adventurers — or to use our American word, “ speculators.” To think of redeeming the lands then, or thereafter, seems to be absurd, in view of their condition, and the present estimate of their market value. Catching at every advantage, real or apparent, allowed them by the law, the purchasers claim the benefit of some statute which they suppose to compensate them for their improvements. They will not redeem — they will get rid of their unfortunate purchase on the best terms they can make for themselves. Possession is abandoned — some depart to other scenes of adventure; some remain, and in the daily sight of their former possessions, behave as though they had lost all present interest and ail expectancy in the lands. The mortgagees treat the lands as their own; they show that they so regard them. They become attached to what they deem their property. All parties show the same understanding in all their behavior. Years afterward, when it is no longer “reasonable ” *that they should have such an [571 “ advantage,” the heirs of one who has so abandoned his property, ask to be “ allowed ” to redeem the lands. Would not the English chancellor have told them they could not do equity at that late day, *572 •and. that by reason of their carelessness they had lost all right before him ? Would he have allowed them to redeem simply because twenty-one years had not elapsed ? I think not. If this had been the ease, in which the attempt was first made to set aside the forfeiture of estate and set up the equity of redemption, I fancy our jurisprudence would have been illustrated by no such title.
Counsel for complainants are certainly right when they say that “whether the mortgagor or mortgagee remain in possession of the property, he holds it subject to the payment of the mortgage claim, until it is extinguished, or their several possessory interests are ripened into absolute rights by lapse of time. The mortgagee has his right of foreclosure, the. mortgagor his right of redemption. The latter must pay the claim ; but if the former obtains possession of the property, as a good steward he must keep an account of th'e rents and profits, and be always ready with it, in liquidation of the mortgage debt, without profit or benefit to himself — liable for waste and negligence, and not allowed for anything but taxes and necessary repairs. And, so jealous is a court of equity to protect this right of redemption, that the mortgagee can do nothing to clog or embarrass it.” Nay, this is not all. So highly is the equity esteemed, and so much regard have the courts in enforcing it to the protection of the debtor from the hardness of his creditor, that the - express stipulation of the parties in the deed of mortgage, will not avail to cut it off. This is the rule, and equity hardly knows an exception to it. And the equity will be revived by the exquisite vigilance of the courts in its behalf by the slightest act or indication in its favor, though more than twenty-one years have elapsed. Nor is this to be set down to the esteem in which the law holds admissions made against the interest of him who makes them. 572] The law discovers *no such jealousy or solicitude in behalf of one who is cut out of his action for the recovery of lands by the operation of the limitation acts on adverse possession. The acknowledgement of title which there destroys the adverse character of the possession, is a far more substantial kind of admission than those which the cunning scrutiny of the chancellor has' so often held sufficient to restore — for that is the true word to express it— the lost equity of redemption.
In plain truth, resisted at first by courts of law, and imposed upon the English system at last by a decided victory gained over common-law stubborness, by the subtle chancellors, the equity of *573 redemption has become a pet of all the courts. Our own Kent allows himself to rise into a sort of extasy in celebrating this triumph of equity over strict law.
This disposition, so manifest in the judges, to indulge a fondness for the equity of redemption, has stimulated some legislative bodies to secure for the equity a liberal regard in the courts. Counsel have referred us to a statute of Rhode Island, authorizing the Supreme Court of that state to allow redemption of any mortgaged estate, after twent years possession, if peculiar circumstances should render it equitable; and in Dexter v. Arnold, 3 Sumn. 152, the circuit court of the United States held “ that it should be governed by that statute, though especially addressed to the state court; first, because it furnished the appropriate analogy upon the known, doctrine of courts of equity; and, second, because it was a mere affirmance of the general principles on which courts of equity act in allowing or refusing a redemption.” In Christian’s edition of Blackstone, the annotator says: “In general, if the mortgagee has been twenty years in possession, the court of chancery, in conformity to the time of bringing an ejectment, will not permit the mortgagor to redeem, unless during part of the the time the mortgagor has been an infant, or a married woman; or, unless the mortgagee admits he holds the estate as a mortgage; or he has kept accounts upon it, and treated it as redeemable, within twenty years; or there is some other [573 special circumstance which forms an exception to the general rule. Eq. Ca. Abr. 313; 2 Bro. 399 ; 2 Ves. Jun. 83; 3 P. Wms, 283; 2 Fonbl. Eq. 264, 267.”
"What then is this equity of redemption, considered not as the spoiled pet of the chancellor, but the sober offspring of justice, treated without fondness on the one hand, or prejudice on the other? Is it a right so absolute, so fixed within the limits of inflexible rules, that the time within which it can be claimed, and the conditions of its existence, are settled, certain, uniform, and unquestionable ? Or, on the contrary, may the time of its dui’ation be lessened, or enlarged — for if one may, the other can be — upon equitable considerations, belonging peculiarly to each case ?
It seems to me a right, governed in its exercise, by a rule so easy and shifting, so open to equitable exceptions, that it can hardly be deemed a rule at all. Long after twenty years, equity may find some special circumstance on which to found a decree allowing redemption. I can not doubt, that long before the lapse of that period, *574 equity may find some special circumstance, on which to found a decree, denying redemption.
Such special circumstances, I think, exist in this case, as warrant a denial of the relief, even if the twenty-one years can, in equity, be deemed not past when this bill waá filed. I have already glanced at these circumstances. They consist in claims as to improvements which are inconsistent with the idea of redemption, and suggestive of an intention wholly to abandon the lands and the equity in them forever; in the quality and condition of the lands; in the relation of sub-purchaser to the first buyer, and of many sub-purchasei’s to each other; in the character, objects, and motives of the purchasers; in the condition of the country generally, in which these lands lay, as to its degree of cultivation, and the habits of its settlers; and in other circumstances and behavior of the pax'ties, among which I take the following to be not the least considerable: While the strict duty, not too strongly stated by complainant’s counsel, rested on the mortgagees of constantly keeping an account, and being always 574] ready with it, *the mortgagor, or those claiming under him, behaved so as to show that no account was expected, and saw without a word of caution, claim, or objection, the making of improvements by the mortgagee, which enhanced the value of the estate, and might “cripple the right or power of redemption.” See 2 Story’s Eq. Jur., sec. 10166.
But in my judgment, equity ought to date the adverse possession from about the time at which it became certain that the defendant, in the ejectment suit, meant to repose on the judgment in that case, and to claim the benefit of the occupying-claimant law. This was in 1822; but as the pi-oceedings under the occupying-claimant law would take some time, it might be fair to extend the time to 1823. Longer, however, I would not extend it to find the date of the substantial possession of the mortgagees. All the delay between the time last mentioned, and the actual execution of the writ of possession, is, in equity, to be charged to Robinson.
Of the admissions contained in the chancery proceedings, I can make nothing available to these complainants. They were not parties; and the admissions were not made by those most largely interested iix the defense of this case. Taking all the facts togethei*, I consider the adverse possession as unbroken, so far as these plaintiffs are concerned.
If this conclusion seems to take too little notice of another ad *575 mission, made in 1827, by taking judgment, I can only say, that against the strong indications in the conduct of all the parties, that they all considered the possession of the original mortgagees as having acquired the character of that which distinguishes absolute ownership, I can feel little disposition to regard the technical or strict logical effect of.the proceedings resorted to, to get-in the title of these lands. Those proceedings were little better than a comedy of errors.
In the whole case, then, I see no equity for the complainants and no difficulty in denying the redemption prayed. It may be that I attach too much importance, and assign an extent too great, to the equitable control of the estate in question ; but existing outside of any deed, the mere creature of equity, words, acts, or silence, may, in my judgment, defeat, as well *as preserve it. I am apt, [575 too, to believe, that there is some true significance in most names. I can not well understand an equity which works injustice ; and if I can laud that which we can call an equity of redemption for anything, it is, that it was invented as a shield against oppression, and that according to the vital conditions of its existence, it can never be made the instrument of vexing the distressed, as, in some exceptional cases, may many of our strict legal rights.